UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WAYNE A. RITCHIE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

_______________________________________/

No. C 00-3940 MHP

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**Re: Motion for Judgment on Partial Findings**

This action arises out of allegations that plaintiff Wayne A. Ritchie was a victim of a federal program that tested psychoactive drugs on unwitting subjects during the 1950s and 1960s. On April 6, 2005, a four-day bench trial commenced on Ritchie's claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. Following the presentation of Ritchie's case-in-chief, the government moved for judgment as a matter of law, which the court construed as a motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).[1] At that point, the court declined to hear additional testimony and gave the parties the opportunity to submit post-hearing memoranda regarding the government's motion. Having considered the parties' submissions and the testimony presented at trial, the court enters the following findings of fact and conclusions of law.

BACKGROUND

I. Facts

Plaintiff Wayne Ritchie is a former Deputy United States Marshal who worked at the United States Post Office Building in San Francisco, California in the mid-1950s.[2] Ritchie's claims against the United States arise from allegations that he was given food or drink laced with lysergic acid diethylamide ("LSD")

while he attended a Christmas party for federal employees held at the Post Office Building on December 20, 1957. Specifically, Ritchie contends that he is the victim of "Project MKULTRA," a Central Intelligence Agency ("CIA") program that was dedicated to the testing of LSD and other psychoactive drugs on unwitting subjects.

The existence of Project MKULTRA is now undisputed, and the government admits that CIA operatives in San Francisco were actively administering LSD to individuals without their knowledge or consent in December 1957. The project's San Francisco-based activities were carried out under the supervision of George White, an agent of the federal Bureau of Narcotics who coordinated a CIA operation known as "Subproject 42" during the period from 1955 to 1963. Am. Joint Pretrial Statement, Undisputed Facts ¶¶ 21-22 (hereinafter "Undisputed Facts"). As the director of Subproject 42, White established a safehouse apartment in San Francisco where CIA Agents tested psychoactive drugs on prostitutes and their clients. Feb. 7, 2003 Dep. of Ira Feldman at 421-27 (hereinafter "Second Feldman Dep."). Ira Feldman, a supervisory group head at the federal Bureau of Narcotics, was among the agents who performed or supervised those testing activities. Undisputed Facts ¶ 22.

Ritchie's recollection of the events of December 20, 1957 is also largely undisputed. On that day, Ritchie reported to work at the Post Office Building and remained at his desk throughout the morning. Id. ¶ 3. Because of the upcoming Christmas holiday, most of Ritchie's co-workers at the Marshal's Office left work at approximately 12:00 p.m. Id. ¶¶ 4, 6; Tr. 50. At that time, Ritchie also briefly left his office to have lunch at the federal employees' Christmas party that was being held in the Press Room of the Post Office Building. Id. Upon arriving at the party, there were only three or four people present. Undisputed Facts ¶ 6. Ritchie stayed only briefly, having something to eat and also having one drink, a bourbon and soda, before returning to his office at approximately 12:30 p.m. Id. ¶¶ 7-8.

Ritchie remained at his desk until approximately 2:00 p.m. Id. ¶ 8. At that time, Ritchie's supervisor, Jim Eagan, returned from lunch and suggested that Ritchie return to the Christmas party, which by then had grown to a size of approximately thirty to fifty people. Id. ¶¶ 8-9. Ritchie took Eagan up on his suggestion and made a second appearance at the party, arriving soon after Eagan's return and staying

for approximately one hour. Id. ¶ 8, 10. During that time, he consumed three or four additional bourbon and sodas. Id. ¶ 8.

At approximately 3:00 p.m., Ritchie returned to his office. Id. ¶ 10. Sitting in his office alone, Ritchie soon began to experience what he has described as feelings of paranoia and worthlessness, which were accompanied by an intense urge to leave the building. Tr. 52-53. Ritchie acted upon this urge at approximately 4:30 p.m., locking the office and leaving work thirty minutes earlier than was his usual practice. Id. at 53; Undisputed Facts ¶ 10.

Ritchie left his car at the Post Office Building parking lot and proceeded to walk home to his apartment on Ellis Street, where he was greeted by Dorothy McGinn. Undisputed Facts ¶ 11. McGinn and Ritchie had been living together for six months in December 1957, and the couple was married in April 1958. Id. ¶ 2; Tr. 81. Prior to that time, McGinn had lived in New York City, and according to Ritchie, she rarely missed an opportunity to comment upon the ways in which San Francisco compared unfavorably to her former home. Tr. 54-55. Ritchie was greeted to one such diatribe when he returned home on the evening of December 20. Id. at 55, 177. For whatever reason, Ritchie found McGinnis' commentary on that occasion to be unusually grating, and he left the couples' apartment soon after he had arrived. Id. at 55; Undisputed Facts ¶ 13.

Ritchie then proceeded to the Vagabond Bar, where he was a regular customer, and ordered two more drinks, again both bourbon and sodas. Id. However, Ritchie continued to experience feelings of restlessness, which he has characterized as shading into paranoia, and he left the bar approximately twenty-to-thirty-five minutes after he had arrived and began to walk toward his office. Tr. 56; Undisputed Facts ¶ 13. It was during his walk to the Post Office Building that Ritchie planned the armed robbery that he was to attempt to carry out later that evening. Tr. 59. The inspiration for this plan remains uncertain, although Ritchie concedes that he was motivated by McGinn's desire to return to New York and his intent to purchase a plane ticket that would permit her to do so. Undisputed Facts ¶ 14. Ritchie also testified that he planned the robbery fully expecting to be caught, imprisoned, and fired from his job at the Marshal's Office, but he explains that he was overcome by a sense of worthlessness that compelled him to engage knowingly in self-destructive conduct. Tr. at 57-58; see also id. ¶ 14.

In the course of his walk, Ritchie stopped at three more bars before arriving at the Post Office Building, although he testified that he ordered only nonalcoholic beverages at each stop, Tr. 58-59. Upon his arrival, Ritchie removed two guns from his locker and retrieved his car from the Post Office Building's parking lot. Undisputed Facts ¶¶ 14-15. From there, he drove to the Fillmore District, which was at the time a heavily African-American neighborhood of San Francisco where Ritchie was certain that he would not be recognized. Id. ¶ 15; Tr. 59. When he reached Fillmore Street, Ritchie parked his car and walked into the nearest bar. Undisputed Facts ¶ 16; Tr. 59. However, upon seeing that there were no customers in the bar, Ritchie left immediately and sought out another target, walking down the street to a second bar, the Shady Grove. Undisputed Facts ¶¶ 16-17. Ritchie entered the Shady Grove, sat down at one end of the bar, and ordered a bourbon and soda. Id. ¶ 17. After finishing his drink, Ritchie walked up to the serving station at the other end of the bar and demanded money from the bartender. Id. The bartender put cash on the counter, but Ritchie demanded more money. Id. At that point, a waitress approached Ritchie from behind and asked him what his was doing. Id. When Ritchie turned around, he was hit on the head and knocked unconscious. Id.

Ritchie was subsequently taken into custody and charged with attempted robbery with a deadly weapon. Id. ¶¶ 17, 20. He pleaded guilty to the offense charged, and on March 12, 1958, he was sentenced to five years probation and was ordered to pay a $500 fine, his sentence of imprisonment having been suspended by the court. Id. ¶ 20. Ritchie resigned from his position at the Marshal's Office immediately following his arrest. Id. ¶ 19.

It did not occur to Ritchie that his aberrant behavior on the evening of December 20, 1957 might have been caused by the ingestion of LSD until the late 1990s, when he learned of Project MKULTRA and other federal programs for testing psychoactive drugs on human subjects. Having been alerted to the possibility that he was a victim of Project MKULTRA, Ritchie filed Notices of Claim with the CIA and Drug Enforcement Agency ("DEA") on October 22, 1999. Those claims were denied on April 26, 2000, and the instant action followed.

## II. Procedural History

### A. Ritchie's Complaint

On October 25, 2000, Ritchie filed the instant action in this court, alleging that his criminal conduct on the night of December 20, 1957 was the product of LSD intoxication and asserting causes of action under the First, Fourth, Fifth, and Eighth Amendments of United States Constitution as well as a claim under the FTCA. The court dismissed Ritchie's constitutional claims on July 12, 2000, holding that they were barred by California's one-year statute of limitations for personal injury actions. However, in its July 1, 2002 order, the court declined to dismiss Ritchie's FTCA claim, and the parties proceeded to adjudicate that claim on the merits, with Ritchie advancing the theory that a government agent introduced LSD into one of the drinks that he consumed during his second visit to the federal employees' Christmas party on December 20, 1957.

B. Summary Judgment

On May 24, 2004, the government moved for summary judgment on two issues related to proof of liability. The government first sought summary judgment on the issue of whether a government agent actually administered LSD to Ritchie on December 20, 1957. The second issue identified by the government's motion focused on what the parties referred to as "LSD causation"—i.e., whether ingesting LSD was the actual and proximate cause of Ritchie's attempted robbery of the Shady Grove Bar. Ritchie opposed that motion as to both issues and cross-moved for summary judgment on the question of whether he was administered LSD by a government agent without his knowledge or consent.

With respect to the first issue identified by the government's motion, Ritchie's attempt to meet his burden of proof on summary judgment relied heavily upon the testimony of Ira Feldman. As noted above, Feldman was a Bureau of Narcotics employee and San Francisco-based Project MKULTRA operative at the time that Ritchie's alleged drugging occurred. At the first of two depositions, Feldman categorically denied any involvement in administering LSD to Ritchie or to anyone else. However, after new evidence surfaced linking Feldman to Project MKULTRA, the court permitted Ritchie's counsel to depose Feldman again. During his second deposition, on February 7, 2003, Feldman recanted his earlier testimony denying his involvement in Project MKULTRA and admitted that he participated in the program under George White's supervision. Second Feldman Dep. at 346-47, 360-63, 428-35. Feldman further testified that he

had been involved in drugging non-consenting victims with LSD, admitting, *inter alia*, that Project MKULTRA agents administered LSD to unwitting victims in bars by slipping the drug into their drinks. Id.[3]

Feldman also testified regarding his knowledge of Ritchie's criminal conduct on the evening of December 20, 1957. Id. at 428-29, 435. In moving for summary judgment, Ritchie characterized this testimony as unambiguously implicating Feldman in Ritchie's drugging. However, the court disagreed, noting various inconsistencies in Feldman's testimony and the lack of any explicit admission from Feldman that he surreptitiously administered drugs to Ritchie or assisted another person in doing so. Order Re Mot. for Summary Judgment at 9-12 (May 24, 2004) (hereinafter "Summary Judgment Order"). Thus, observing that such testimony left it "in the position of essentially inferring facts from sideways comments, rather than from explicit testimony," the court held that Feldman's deposition testimony, while sufficient to create a genuine issue of material fact on the question of whether Ritchie was drugged by a government agent, fell well short of what was required to enter summary judgment in Ritchie's favor. Id. at 11-12.

With respect to the second, "LSD causation" issue raised by the government's motion, Ritchie's principal evidence proffered was then, as it is now, the testimony of Dr. James S. Ketchum, a psychiatrist who tested LSD and other psychoactive drugs on enlisted miliary personnel at Edgewood Arsenal, Maryland during his service as an officer in the United States Army "Chemical Corps." As he relates in his expert report, Dr. Ketchum evaluated Ritchie using a "differential diagnosis" methodology, through which he sought to disaggregate the various causal factors that may have contributed to Ritchie's conduct on December 20, 1957. James S. Ketchum, Psychiatric Evaluation of Wayne Ritchie, at 8-20 (Dec. 5, 2001) (hereinafter "Ketchum Rep."). After examining Ritchie, Dr. Ketchum ruled out both alcohol intoxication and endogenous factors as likely explanations for Ritchie's behavior and concluded that LSD-induced temporary psychotic disorder was the only possible explanation for Ritchie's decision to hold up the Shady Grove Bar. Id. Contrasting this evidence with the conflicting opinions of two medical experts retained by the government, the court held that Dr. Ketchum's testimony was sufficient to create a triable issue of fact as to whether LSD intoxication caused Ritchie to attempt to commit armed robbery on December 20, 1957. Summary Judgment Motion at 17-18. Accordingly, the court denied both parties' motions for summary judgment in their entirety, id. at 18, and Ritchie's FTCA claim proceeded to trial.

C. Trial

Beginning on April 6, 2005, the court held a four-day bench trial on Ritchie's FTCA claim. In presenting his case-in-chief, Richie called two live witnesses, himself and Dr. Ketchum. In addition, Ritchie relied on the deposition testimony of a number of witnesses who were unavailable to testify at trial, including various segments of Ira Feldman's deposition that he introduced for the purpose of establishing the government's involvement in his drugging. At the close of Ritchie's case-in-chief, the government moved to exclude Dr. Ketchum's testimony, asserting a number of grounds for disqualifying him as an expert under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In addition, the government moved for judgment as a matter of law, which the court acknowledged to be a motion for judgment on partial findings in a bench trial pursuant to Federal Rule of Civil Procedure 52(c).

Ruling from the bench, the court denied the government's Daubert motion, finding that Dr. Ketchum is qualified as an expert as to the effects as LSD on individuals. Tr. 671-72. The court nonetheless found that Dr. Ketchum's methodology for determining whether LSD caused Ritchie's behavior suffered from "a number of flaws," id. at 672, and that in any event, the evidence that Ritchie was administered LSD by a government agent or by anyone else on December 20, 1957 was not sufficient to meet his burden of proof on that issue, id. at 672-75. The court thus tentatively granted the government's motion for judgment on partial findings and permitted the parties to file post-trial memoranda for the purpose of addressing whether Ritchie had presented sufficient evidence to meet his burden of proving his FTCA claim.

Ritchie subsequently requested leave to file a supplemental memorandum in light of his failure to anticipate the arguments raised in the government's brief in support of its motion. The court granted that request and his since received supplemental memoranda from both parties. Thus, having received all of the relevant post-trial submissions, the government's motion for judgment on partial findings is now ripe for adjudication.

LEGAL STANDARD

Federal Rule of Civil Procedure 52(c) states:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that

party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue . . . .

Fed. R. Civ. P. 52(c). A judgment entered pursuant to Rule 52(c) must be supported by findings of fact and conclusions of law. Id. As with finding of fact made after a completed bench trial, findings of fact made pursuant to Rule 52(c) are reviewed on appeal for clear error; the district court's legal conclusion are reviewed de novo. Dubner v. City & County of San Francisco, 266 F.3d 959, 964 (9th Cir. 2001) (citations omitted).

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The government's motion for judgment on partial findings requires the court to determine whether Ritchie can prove that he was unwittingly administered LSD by a federal agent on December 20, 1957 and that his reaction to the drug caused him to attempt to rob the Shady Grove Bar on that date. In resolving these issues, the court is required to set forth findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(c). However, before doing so, it must first address Ritchie's contention that he is entitled to a favorable evidentiary inference on the issue of liability.

I. Ritchie's Entitlement to a Favorable Evidentiary Inference

A. The CIA's Destruction of Documents

As noted above, Ritchie argues that he should benefit from a favorable evidentiary inference on the issue of liability. The first basis he identifies for drawing such an inference is the CIA's destruction of files related to Project MKULTRA in 1973. Citing the findings of the report of the Senate Select Committee that investigated the CIA's testing of psychoactive substances on human subjects ("the Church Committee"), Ritchie asserts that the CIA intentionally destroyed Project MKULTRA-related documents in contravention of its own document-retention policy and that it did so for the purpose of precluding future claimants from obtaining access to the documents. See Final Report of the Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, 94th Cong., 2d Sess. at 404 (Apr. 26, 1976) (hereinafter "Church Committee Report"). Ritchie thus urges the court to infer that the destroyed files must have included documents tending to establish that he was drugged by a CIA operative.

The court assumes without deciding that the government had a duty to preserve documents related to Project MKULTRA at the time that the project-related files were destroyed. That was the holding of the Second Circuit in Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998), appeal after remand, 213 F.3d 626 (2d. Cir. 2000), cert. denied, 531 U.S. 1078 (2001), which, like the instant action, involved a claim that the CIA administered LSD to an unsuspecting individual in the 1950s. Id. at 116, 127. This court has reason to doubt the wisdom of the Second Circuit's resolution of that issue. Nevertheless, as the Kronisch court recognized, the mere fact that a litigant has a duty to preserve evidence is not by itself sufficient to warrant inferring that the evidence destroyed would have been unfavorable to the party responsible for its destruction. Rather, the Second Circuit made clear that the party seeking to benefit from such an inference must make "some showing indicating that the destroyed evidence would have been relevant to the contested issue." Id. at 127 (citing Stanojev v. Ebasco Services, Inc., 643 F.2d 914, 923-24 (2d Cir.1981), and Skeete v. McKinsey & Co., No. 91 Civ. 8093, 1993 WL 256659, at *7 (S.D.N.Y. July 7, 1993)). Thus, citing Wigmore's treatise, the Kronisch court concluded that a party seeking to draw an adverse inference from the destruction of a document must "first introduce[] some evidence tending to show that the document actually destroyed . . . is the one as to whose contents it is desired to draw an inference." Id. at 127-28 (quoting 2 John Henry Wigmore, Evidence in Trials at Common Law § 291, at 228 (James H. Chadbourn rev. 1979)) (original emphasis omitted)

Kronisch was cited with approval by the Ninth Circuit in Medical Laboratory Management Consultants v. American Broadcasting Cos., 306 F.3d 806 (9th Cir. 2002). See id. at 825 (quoting Kronisch, 150 F.3d at 128) (original alterations omitted) (observing that "when a party has produced no evidence—or utterly inadequate evidence—in support of a given claim, the destruction of evidence, standing alone, is not enough to allow the party to survive summary judgment on that claim"). The rule that the Kronisch court adopted also comports with common sense; indeed, if no such showing were required, the finder of fact would be permitted to take the speculative assertions of the party seeking to benefit from the adverse inference at face value. Such a result would be contrary to the purpose of sanctioning the destruction of evidence, which is intended to "place the innocent party in the same position [that] he would have been in had the evidence not been destroyed." Kronisch, 150 F.3d at 127. Accordingly, the court

finds the rule set forth in Kronisch to be apposite to the materially indistinguishable facts of the instant action.

That being the case, the procedural posture of this action differs from Kronisch, which came before the Second Circuit on appeal of the district court's order granting the defendants' motion for summary judgment. See 150 F.3d at 120. In contrast, the plaintiff in the case at bar has survived summary judgment and now bears the burden of proving his claim to the finder of fact. This distinction is critically important, as Ritchie has now had the opportunity to present his case-in-chief at trial but has nonetheless failed to submit even a scintilla of evidence tending to establish that the CIA destroyed any documents pertaining to him, much less that it destroyed documents tending to show that he was drugged by a government agent on December 20, 1957. This court simply cannot permit Ritchie to substitute speculation about what "must have" been in the CIA's Project MKULTRA-related files for facts tending to show that the files probably (or even possibly) contained evidence that would have proven his claim. This is particularly true in light of the manifest weakness of the circumstantial evidence that Ritchie presented at trial, which is discussed at length below. The court therefore finds that the CIA's destruction of Project MKULTRA-related files does not entitle Ritchie to a favorable evidentiary inference on the issue of liability.

B. Obstruction of the Second Feldman Deposition

Ritchie's second ground for urging the court to draw an inference in his favor on the issue of liability arises from the conduct of Assistant United States Attorney ("AUSA") Patricia Kenney during Ira Feldman's second deposition. In its January 5, 2005 order, the court found Kenney's "obdurate" behavior during that deposition to be sanctionable under Federal Rule of Civil Procedure 30(b)(3) and thus imposed monetary sanctions against Kenney and her client. Order Re Sanctions at 15-16 (January 5, 2005) (hereinafter "Sanctions Order"). Ritchie now argues that the court should also sanction Kenney's behavior by inferring that Feldman would have incriminated himself in Ritchie's drugging if counsel had been permitted to continue questioning him without interruption.

As the court noted in its January 2005 order, Rule 30(b)(3) permits the court to impose "an appropriate sanction" against any person responsible for frustrating the fair examination of a deponent. Fed. R. Civ. P 30(b)(3). The court also has the inherent authority to sanction discovery-related misconduct

when that conduct interferes with "the orderly administration of justice and the integrity of the court's orders." Halaco Eng'g Co. v. Costle, 843 F.2d 376, 380 (9th Cir. 1988) (citing United States v. National Med. Enters., Inc., 792 F.2d 906, 912 (9th Cir.1986)). Ultimately, the imposition of sanctions is left to the sound discretion of the court. See Anheuser-Busch, Inc. v. Natural Beverages Distribs., 69 F.3d 337, 348 (9th Cir. 1995) (citing Halaco, 843 F.2d at 379).

There is little doubt that under certain circumstances, sanctions for an attorney's misconduct during discovery may include drawing an adverse evidentiary inference against his or her client. Cf. Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983) (noting that discovery abuses may lead to imposition of default judgment or preclusive sanctions under "extreme circumstances"). However, the court has already made it clear that such circumstances are not present here. As noted above, the court's January 2005 order found Kenney's behavior during Feldman's second deposition to be "obdurate" and "unprofessional." Sanctions Order at 15. Nevertheless, the court observed that the sanctions that Ritchie sought—establishing the liability element of his claim as a matter of law—were "grossly out of proportion" to the harm caused by Kenney's misconduct. Id. Thus, while the court found it appropriate to impose less severe sanctions under Rule 30(b)(3), it refused to permit Ritchie to use Kenney's behavior "as an excuse to avoid his obligation to prove his prima facie claim for relief by presenting evidence at trial" and thus denied his request for preclusive sanctions. Id.

There is nothing in the record to suggest that a different conclusion is warranted with respect Ritchie's latest attempt to avoid his obligation to present evidence that would prove his claim. Indeed, whatever effect Kenney's misconduct might have had on Feldman's willingness to confess to administering LSD to Ritchie, Ritchie's own testimony, which is discussed below, conclusively establishes that Feldman was not at the federal employees' Christmas Party on December 20, 1957. Tr. 138; see also Undisputed Facts ¶¶ 9, 23. In light of such uncontroverted evidence, it is wholly inappropriate to infer Feldman's involvement in Ritchie's drugging from a few ambiguous statements in his deposition testimony.[4] The court therefore rejects Ritchie's attempt to draw an evidentiary inference in his favor from Kenney's conduct during the second Feldman deposition.

II. Findings of Fact

Having concluded that Ritchie cannot rely on favorable evidentiary inferences to relieve himself of the burden of proving his claim, the court must now turn to the factual issues raised by the government's motion for judgment as a matter of law. As noted above, that motion identifies two related factual determinations that the court must make in order to adjudge the government liable under the FTCA. First, the court must consider whether a federal agent administered LSD to Ritchie at the federal employees' Christmas party held at the Post Office Building on December 20, 1957. If the court answers that question in the affirmative, it must then determine whether the ingestion of LSD caused Ritchie to attempt to rob the Shady Grove bar later that evening. To prevail under the FTCA, Ritchie must prove both the commission of the tortious act and the element of causation by a preponderance of the evidence.

The court first considers whether the evidence in the record establishes that Ritchie was drugged by a government agent at the federal employees' Christmas party that took place on December 20, 1957. As noted above, Ritchie's attendance at that party is not in doubt, nor is the fact that he consumed food and drink at the party. It is thus at least theoretically possible that someone could have laced that food or drink with LSD. Based on Dr. Ketchum's testimony regarding the effects of LSD intoxication, this would have been most likely to have occurred during Ritchie's second appearance at the Christmas Party, at approximately 2:00 p.m. on the afternoon of December 20. Tr. 471, 483. However, among the thirty to fifty people who were in the Press Room at that time, Ritchie could not identify anyone as a likely Project MKULTRA operative. Indeed, it is particularly significant that Ritchie does not recall seeing Ira Feldman or George White at the party, both of whom he would have assuredly recognized on sight. Tr. 138; Undisputed Facts ¶¶ 9, 23. Accordingly, while it may be true that Ritchie did not know every person who was in attendance at the Christmas party,[5] his assertion that a Project MKULTRA agent must have been there and must have laced one of his drinks with LSD is purely speculative.

Nothing in Ira Feldman's deposition testimony is to the contrary. Feldman's description of Ritchie's behavior on the evening of December 20, while colorful, falls well short of an unambiguous admission of guilt.[6] As this court has previously observed, the passages from Feldman's deposition on which Ritchie relies can easily be characterized as a "needless and unfortunate comparison" of Ritchie's behavior with that of Feldman's victims rather as an admission that Ritchie was himself one of those victims.

Summary Judgment Order at 10-11. The court has also already commented upon counsel's failure to make any attempt to clarify such ambiguity, observing:

> It is also noteworthy that on no occasion did plaintiff's counsel follow Feldman's allusions to Ritchie with more direct questioning designed to pin down precisely what Feldman intended to be saying. The absence of such questioning certainly does not eviscerate the potential veracity of plaintiff's asseverations regarding Feldman's admissions, but nonetheless it leaves this court in the position of essentially inferring facts from sideways comments, rather than explicit testimony.

Id. at 11 (endnotes omitted). As Feldman did not testify at trial, this observation applies with equal force here. Accordingly, Feldman's testimony would be entitled to little weight under the best of circumstances, and it certainly fails to overcome the obvious inference that can be drawn from Ritchie's testimony that he did not see Feldman at the party, that being that Feldman was not there and thus could not have put LSD in Ritchie's drink.

This leaves Ritchie to rely on evidence that certain federal agents who lived and worked in San Francisco in December 1957 were administering LSD to unwitting victims and that some of those agents would have been invited to attend the federal employees' Christmas party on December 20 as the sole basis for inferring that a Project MKULTRA agent was present at the party and administered LSD to him there. However, there is nothing in the record that supports such a speculative inference. The court thus finds that Ritchie has failed to prove that he was drugged by a government agent on the date in question.

In fact, it is doubtful that Ritchie was unwittingly drugged by anyone on December 20, 1957. Admittedly, Ritchie testified to having a number of physical and psychological symptoms that could plausibly be characterized as reactions to LSD, including feelings of paranoia and restlessness, the blurring of his peripheral vision, and a sense that he was moving effortlessly as he walked home from the Post Office Building on the evening of December 20. Tr. 52-54, 501. The court does not doubt the sincerity of Ritchie's testimony. At the same time, proper consideration must be given to the inevitable blurring of one's recollection with the passage of time, as well as to Ritchie's understandable desire to seek an explanation for his behavior on the evening of December 20, 1957 that would absolve him of responsibility for what he had for many years considered to be an unforgivable lapse of judgment. Thus, while it cannot be

discounted entirely, Ritchie's testimony regarding the symptoms that he subjectively experienced after he left the Christmas party must be viewed with a healthy dose of skepticism.

Moreover, there are other plausible explanations for the symptoms that Ritchie described, including mild intoxication or some undiagnosed organic condition. The court is mindful that Dr. Ketchum opined that LSD-induced psychotic disorder is the sole possible explanation for Ritchie's conduct on the evening of December 20, 1957. Id. at 308. Specifically, in performing his "differential diagnosis" of Ritchie, he ruled out alcohol intoxication or alcoholism as causes of Ritchie's criminal conduct. Id. at 309-10, 486-87. The court agrees that alcohol consumption was not likely to have been the sole factor that led Ritchie to attempt to rob the Shady Grove that evening. The record establishes that Ritchie was at the time a habitual drinker who drank to excess with occasional-to-moderate frequency, see generally id. at 166-70, but there is no evidence that he suffered from alcohol dependency. Moreover, although Ritchie had at least seven drinks over the course of the four-to-six hour period prior to the time that he attempted to rob the bar, his testimony is consistent with the relatively high tolerance for alcohol that one would suspect from a habitual drinker.

Nevertheless, it is still possible, and the court believes likely, that Ritchie's behavior was caused by some organic factor, either alone or in combination with a modest degree of alcohol intoxication. It is also possible that Ritchie's apparent lapse of judgment was exactly what it appears to be. Dr. Ketchum's testimony completely discounts these possibilities. In so doing, he makes the leap from a diagnosis that Ritchie's symptoms were consistent with LSD intoxication (a point on which the court agrees) to the conclusion that Ritchie must have been given LSD at the Christmas party. However, while Dr. Ketchum went to great lengths to disabuse the court of the popularly held notion that users of LSD invariably experience the drug's "psychedelic" effects, see id. at 261-23, the upshot of his testimony is that the effects of LSD ingestion vary widely with the amount of the dose, the circumstances under which the drug is taken, and the user's mental state at the time he is given the drug. See, e.g., id. at 557 (observing that "perceptual distortions [caused by LSD ingestion] are so variable that it's almost impossible to list all of them"); id. at 573 (discussing the effects of the setting under which LSD is consumed on the symptoms reported by the subjects of clinical testing). To take the inference that he draws from Ritchie's behavior to its logical

UNITED STATES DISTRICT COURT
For the Northern District of California

conclusion, the court would be compelled to find that LSD intoxication is the likely cause of almost any unexplained and superficially inexplicable behavior. Such a finding would of course be erroneous, and so the premise upon which it is based is equally suspect. Yet that premise is precisely what the court would be required to believe to credit Dr. Ketchum's testimony on the issue of causation. The court therefore finds that his testimony is appropriately disregarded, and in any event is not persuasive, to the extent that its seeks to establish a causal connection between the ingestion of LSD and Ritchie's criminal behavior on the evening of December 20, 1957.

Seeing that there is no other evidence that the ingestion of LSD caused Ritchie to commit attempted robbery on the evening of December 20, 1957, the court finds that Ritchie has not shown that he ingested LSD on that date, much less that he was drugged by a government agent without his knowledge or consent. It thus follows *a fortiori* that Ritchie has not established that it is more likely than not that LSD-induced psychotic disorder caused him to attempt to rob the Shady Grove Bar.

III. Conclusions of Law

The FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. Consequently, the federal government may generally be found liable for torts, including the type of personal injury claim asserted in the instant action, whenever liability could also be found with respect to a private actor. See Taghadomi v. United States, 401 F.3d 1080, 1083 (9th Cir. 2005). To prevail on his personal injury claim, Ritchie must prove by a preponderance of the evidence that he was given LSD by a government agent without his knowledge and consent on December 20, 1957 and that the ingestion of LSD caused him to attempt to rob the Shady Grove Bar later that evening.

Based on the findings of fact set forth above, it is clear that Ritchie cannot meet his burden of proof with respect to either of those elements of his claim. Specifically, the court concludes that:

1. Ritchie has not proven that he was administered LSD by an agent of the federal government or by anyone else on December 20, 1957; and

2. Ritchie has not established by a preponderance of the evidence that his criminal conduct on the evening of December 20, 1957 was caused by LSD-induced psychotic disorder.

Accordingly, because Richie has been fully heard on each of these issues and an adverse finding as to either would be sufficient to defeat his claim under the FTCA, the court concludes it is appropriate to enter judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c). The court therefore grants the government's motion for judgment on partial findings.

The foregoing findings of fact and conclusions of law are deemed the court's findings and conclusions pursuant to Rule 52(a). Any findings of fact contained in the conclusions shall be deemed findings of fact and any conclusions of law contained in the findings shall be deemed conclusions of law.

CONCLUSION

For the reasons stated above, the court GRANTS defendant's motion for judgment on partial findings. A judgment shall enter accordingly.

IT IS SO ORDERED.

Dated: July 5, 2005

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

**ENDNOTES**

1. As the United States subsequently realized, Federal Rule of Civil Procedure 50, which governs motions for judgment as a matter of law, applies only to trials by jury. See Fed. R. Civ. P. 50. In a bench trial, Rule 52(c) sets the proper standard for moving for judgment on partial findings at the close of the plaintiff's case-in-chief. See Fed. R. Civ. P. 52(c).

2. The Post Office Building, located at the intersection of 7th and Mission Streets, now houses the United States Court of Appeals for the Ninth Circuit. In 1957, the building was occupied by this court.

3. Feldman's testimony is ambiguous as to whether he actually gave LSD to unwitting victims in bars himself. While on balance the court finds it likely that he did, that conclusion does not affect the outcome of these proceedings, which turns on whether Feldman (or some other, unidentified government agent) administered LSD to Ritchie without his knowledge and consent.

4. The justification for such an adverse inference is particularly weak in light of Feldman's advanced age and deteriorating physical condition, which were doubtlessly compounded by the characteristically incoherent examination style that Ritchie's counsel employed in taking his deposition.

5. The court nonetheless notes that Ritchie testified that he "recognized most of [the people at the party] from working around the courts." Tr. 144.

6. As the court observed in its May 2004 order denying the parties' cross-motions for summary judgment, there are three passages from Feldman's February 2003 deposition in which he arguably inculpates himself in Ritchie's drugging. In the first such passage, Feldman stated: "I drugged guys involved in about ten, twelve, period. [sic] I didn't do any follow-up, period, because it wasn't a very good thing to go and say 'How do you feel today?' You don't give them a tip. You just back away and let them worry like this nitwit, Ritchie." Second Feldman Dep. at 428. Following that statement, Feldman engaged in a colloquy with counsel in which he appeared to inculpate himself in Ritchie's drugging a second time:

> Q. When you say 'let them worry,' you mean let them have a full head of LSD and let–
>
> A. Let them have a full head, like what happened, like what happened with this nut when he got out and got drunk.

Id. at 428-29. Later, Feldman was asked if he were essentially "deciding who was going to suffer," and implicitly referenced Ritchie a third time, replying that:

> I didn't say anybody had suffered. I didn't say anybody suffered. The bird, like this guy, who saw snakes coming out, he deserved to suffer. He had eight or ten drinks and then goes out and gets a couple of guns and tries to hold up someone.

Id. at 435.